

FILED UNDER SEAL

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** _____ |
| v. | : | **DATE FILED:** 8-3-21 |
| **SANDEEP HARDIKAR** | : | **VIOLATION:** |
| | : | 18 U.S.C. § 371 (conspiracy to commit wire fraud, mail fraud, honest services fraud, federal program bribery, and False Claims Act offenses – 1 count) |
| | : | Notice of forfeiture |

## INFORMATION

### COUNT ONE

**THE UNITED STATES ATTORNEY CHARGES THAT:**

At all times material to this information:

### Amtrak and Federal Funding

1. Congress created the National Railroad Passenger Corporation, doing business as Amtrak, as a private, for-profit corporation, pursuant to the passage of the Rail Passenger Service Act of 1970, as amended, to operate a nationwide system of passenger rail transportation. Amtrak received significant federal funding through grants from the United States Department of Transportation ("DOT") to cover its activities associated with the Northeast Corridor and the National Network as authorized by the Fixing America's Surface Transportation Act (Div. A; Pub. L. No. 114-94).

2. In addition to providing a substantial portion of Amtrak's funding, the federal government also provided oversight of how the funds were spent. The Federal Railroad Administration ("FRA"), as part of the DOT, administered the grants to Amtrak and provided

federal oversight of Amtrak's grants. Amtrak's ownership and corporate structure were heavily controlled by the federal government. The United States government, through the Secretary of the DOT, owned all issued and outstanding preferred Amtrak stock.

3. Pursuant to 49 U.S.C. § 24302, Amtrak's ten-member Board of Directors was comprised of the Secretary of the DOT; the President of Amtrak, who was appointed by the members of the Board; and eight members nominated by the President of the United States and confirmed by the U.S. Senate. In selecting individuals for nomination to the Board, the President was required to consult with the Speaker of the House of Representatives, the minority leader of the House of Representatives, the majority leader of the Senate, and the minority leader of the Senate, to try to provide adequate and balanced representation of the major geographic regions of the United States served by Amtrak. These branches of the federal government exercised substantial supervision over Amtrak's operations. Amtrak was required to submit annual reports to Congress and the President of the United States detailing such information as route-specific ridership and on-time performance. Congress conducted oversight hearings to delve into details of Amtrak's budget, routes, and prices. In addition, the Freedom of Information Act (5 U.S.C. § 552) applied to Amtrak.

4. Amtrak was substantially supported by federal funds. In 2016 and 2017, Amtrak received over $1,000,000,000 in federal appropriations each year. In 2018 and 2019, Congress approved Amtrak to receive approximately $1,950,000,000 each year in federal funding through DOT grants for the Northeast Corridor and the National Network.

### 30th Street Station Repair and Restoration Project

5. Amtrak had a major railroad station located at 2955 Market Street in Philadelphia, Pennsylvania. The station was located at the intersection of 30th Street and Market

2

Street, and was commonly referred to as 30th Street Station. The construction of 30th Street Station began in 1929 and finished in 1933. In or about early 2015, companies were invited to bid on a project that would repair and restore the existing façade of 30th Street Station.

6. On or about December 10, 2015, Mark 1 Restoration ("Mark 1") was awarded a $58,473,000 contract by Amtrak. Mark 1 was the main contractor on this 30th Street Station façade repair and restoration project. On August 25, 2016, Vega Solutions ("Vega") was awarded a $1,309,040.06 construction management contract by Amtrak. Vega's role was to monitor the work that Mark 1 performed on the repair and restoration project.

7. PERSON-1, known to the United States Attorney, was employed by Amtrak as the Project Manager on the repair and restoration project. In that capacity, PERSON-1 was responsible for communicating with Mark 1 and Vega about the work being done on 30th Street Station.

8. PERSON-1 was also responsible for reviewing the invoices, change orders, and requests for payment that Mark 1 and Vega submitted to Amtrak. PERSON-1 had the power to approve, or reject, these invoices, change orders, and requests for payment. Although PERSON-1 did not have the singular authority to approve Amtrak payments to Mark 1 and Vega, his/her approval was a critical step in that process.

9. Federal funding supplied approximately 90 percent of the money Amtrak used to pay Mark 1 and Vega on the contracts relating to the repair and restoration of the 30th Street Station façade.

### Defendant SANDEEP HARDIKAR and Vega

10. Vega was a small company based in Boyds, Maryland. PERSON-2, known to the United States Attorney, was the President and sole owner of Vega. Vega's website

3

reported the company was a "woman-owned project management consulting firm" that had "expertise in all aspects of project management, including Scheduling, Estimating, and Cost Control."

11. Defendant SANDEEP HARDIKAR was the close relative of PERSON-2. Although defendant HARDIKAR had no ownership stake in Vega, and had no title with Vega, defendant HARDIKAR was the de facto owner and operator of the company.

12. Vega was organized as a Subchapter S corporation ("S corporation"). Legally, the profits earned by Vega passed through to the owner of the company, PERSON-2. Factually, the profits earned by Vega belonged to defendant SANDEEP HARDIKAR.

13. Defendant SANDEEP HARDIKAR was the sole owner and employee of Janust Solutions ("Janust"). In 2013, and again in 2018, Janust was awarded a multi-year contract with Amtrak's Program Management Office ("PMO"). Defendant HARDIKAR used Amtrak office space in Philadelphia, Pennsylvania, for his work on the PMO contract.

14. The PMO contracts that defendant SANDEEP HARDIKAR worked on were unrelated to the repair and restoration of the façade at 30th Street Station.

### Defendant SANDEEP HARDIKAR and PERSON-1

15. Defendant SANDEEP HARDIKAR met PERSON-1 in 2015. At that time, defendant HARDIKAR and PERSON-1 worked in the same Amtrak office space.

16. On or about November 3, 2015, PERSON-1 sent an email to Amtrak's Procurement Department adding Vega as a company that intended to bid on the construction management contract. PERSON-1 knew that defendant SANDEEP HARDIKAR was connected to Vega when PERSON-1 sent the email.

4

17. In or about 2015 and 2016, defendant SANDEEP HARDIKAR asked PERSON-1 for assistance in helping Vega prepare and submit a bid for the construction management contract. PERSON-1 repeatedly provided such assistance. These communications were in direct violation of Amtrak's rules and, if discovered, would have disqualified Vega from the bidding on the contract.

18. The $1,309,040.06 construction management contract awarded to Vega by Amtrak, represented Vega's largest single contract. The contract was scheduled to run from August 25, 2016, through December 31, 2018. Due to Vega exhausting all available funds, on September 18, 2018, pursuant to a change order, Amtrak awarded an additional construction management contract to Vega in the amount of $2,911,195.56. The additional contract was scheduled to run until December 31, 2019.

19. Defendant SANDEEP HARDIKAR knew that PERSON-1 was responsible for reviewing the invoices, change orders, and requests for payment that Vega submitted to Amtrak. Defendant HARDIKAR also knew that PERSON-1 was authorized to accept, or reject, the charges that Vega submitted.

### Amtrak's Payment of Vega Relied on Wire Transfers

20. As President and owner of Vega, PERSON-2 signed the monthly payment requests that Vega submitted to Amtrak under the construction management contract. By his/her signature, PERSON-2 agreed to the following:

> I hereby certify that the accompanying Application for Payment, invoices, claim, request for equitable adjustment or other request for payment (collectively "payment request"): (1) is made in good faith and in compliance with the requirements of the Contract; (2) is consistent with the Contractor's books and records, and that the supporting data are accurate and complete to the best of my knowledge and belief; (3) that the amount(s) requested include only allowable costs eligible for payment in accordance with the terms of the Contract; and (4)

5

that the amount(s) requested accurately reflects the amount of payment to which Contractor is entitled.

21. Defendant SANDEEP HARDIKAR, PERSON-1, and PERSON-2 all knew that Vega's payment requests failed to comply with this language.

22. PERSON-2 mailed Vega's monthly payment requests from Boyds, Maryland, to defendant SANDEEP HARDIKAR in Voorhees, New Jersey. Defendant HARDIKAR then hand-delivered Vega's payment requests to PERSON-1 in Philadelphia, Pennsylvania.

23. After reviewing the Vega payment requests, PERSON-1 was responsible for signing and dating an Amtrak document. That document, entitled "Payment Review and Approval Form," required PERSON-1 to sign beneath the following attestation:

> I have reviewed the invoice(s) for progress, quality of work, and quantities shown as well as the validity of the work elements and sufficient funding. I recommend the invoice(s) be approved as submitted or with the following changes.

24. PERSON-1 approved every payment request that was submitted by defendant SANDEEP HARDIKAR on behalf of Vega. After PERSON-1 approved Vega's payment requests, he/she forwarded the documents to additional Amtrak employees, who were responsible for reviewing the same information. Once these reviews were completed, Amtrak could issue a payment to Vega.

25. On November 14, 2016, January 24, 2017, February 22, 2017, March 24, 2017, and April 25, 2017, the Disbursement Operations Department of Amtrak (the "DOD") issued written checks that were made payable to "Vega Solutions Inc." The DOD is located in Philadelphia, Pennsylvania. Each check listed Vega's business address in Boyds, Maryland, and each check was mailed to that business address. PERSON-2 deposited these checks at banks located in Germantown, Maryland, and Rockville, Maryland.

6

26. On May 23, 2017, PERSON-2 signed and submitted a form to Amtrak requesting that future payments to Vega be made via an electronic funds transfer ("EFT"). PERSON-2 designated TD Bank, in Germantown, Maryland, as the financial institution where Amtrak should wire payments to Vega.

27. From on or about June 13, 2017, until on about November 14, 2019, Amtrak's payments to Vega for the construction management contract were made via a series of interconnected wire transfers. This process began with the DOD office in Philadelphia, Pennsylvania, authorizing the payment of a specific amount to Vega. The DOD office then sent a wire transmission to an Amtrak-controlled bank account in Syracuse, New York. From Syracuse, New York, another wire transmission sent that specific amount to a TD Bank in Germantown, Maryland, to compensate Vega.

## **THE CONSPIRACY**

28. From at least on or about November 1, 2016, until on or about November 14, 2019, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

**SANDEEP HARDIKAR,**

together with PERSON-1 and PERSON-2, conspired and agreed to commit wire fraud, mail fraud, honest services fraud, federal program bribery, and False Claims Act offenses in violation of the following federal criminal laws:

    a. mail fraud, by devising a scheme to defraud and for obtaining and trying to obtain money and property by means of false and fraudulent pretenses, in violation of Title 18, United States Code, Section 1341;

7

b. mail fraud, by devising a scheme to defraud Amtrak, and its shareholders, of the intangible right of honest services owed by PERSON-1, in violation of Title 18, United States Code, Sections 1341 and 1346;

c. wire fraud, by devising a scheme to defraud and for obtaining and trying to obtain money and property by means of false and fraudulent pretenses, in violation of Title 18, United States Code, Section 1343;

d. wire fraud, by devising a scheme to defraud Amtrak, and its shareholders, of the intangible right of honest services owed by PERSON-1, in violation of Title 18, United States Code, Sections 1343 and 1346;

e. federal program bribery, by corruptly giving, offering, or agreeing to give things of value to PERSON-1, intending to influence and reward PERSON-1 in connection with a transaction and series of transactions at Amtrak involving $5,000 or more, in violation of Title 18, United States Code, Section 666(a)(2); and

f. False Claims Act violations, by knowingly making or presenting a claim that was false, fictitious, or fraudulent, to an agency or department of the United States, in violation of Title 18, United States Code, Section 287.

## MANNER AND MEANS

29. Defendant SANDEEP HARDIKAR sought to make as much money as he could on the construction management contract. To achieve this financial goal, defendant HARDIKAR conspired with PERSON-1 and PERSON-2 to develop schemes to defraud Amtrak and to enrich themselves. This included defendant HARDIKAR performing the following acts or causing the acts to be performed:

**Things of Value Defendant SANDEEP HARDIKAR Gave to PERSON-1**

a) Defendant SANDEEP HARDIKAR paid PERSON-1 approximately $150,000 in cash bribes. PERSON-1 initially demanded cash bribes from defendant HARDIKAR in the late-Spring or early-Summer of 2017. HARDIKAR paid these bribes from June of 2017 through November of 2019. The bribes ranged from $4,000 to $8,000 in cash each month. HARDIKAR delivered the cash bribes to PERSON-1 in a trailer in Philadelphia, Pennsylvania. The cash bribes were handed to PERSON-1 at the same time that HARDIKAR submitted Vega's payment requests to PERSON-1;

b) Defendant SANDEEP HARDIKAR provided PERSON-1 with a 2017 Ford Explorer and, later, a 2019 Ford Explorer Platinum. PERSON-1 used these vehicles from January of 2017 through November of 2019. PERSON-1 did not need these vehicles because PERSON-1 sat in a trailer directly across the street from the 30th Street Station. This meant PERSON-1 could walk to the job site in a matter of minutes. Vega nonetheless billed Amtrak for the cost of leasing the Ford Explorers, and Amtrak paid Vega $34,557.44 to cover these costs;

c) Defendant SANDEEP HARDIKAR provided PERSON-1 with the sole authority to hire Vega employees for this project. Defendant HARDIKAR knew that some of the newly hired employees were not needed. Vega nonetheless billed Amtrak for their wages, thereby triggering contractually obligated payments by Amtrak to Vega in the total amount of $22,322.05;

d) Defendant SANDEEP HARDIKAR permitted PERSON-1 to determine the bonuses that Vega employees received for their work on the project at

9

30th Street Station. The bonuses that were paid exceeded $10,000. Defendant HARDIKAR did not know if PERSON-1 took any of the bonus payments for himself;

e) Defendant SANDEEP HARDIKAR provided PERSON-1 with a personal credit card, and two business credit cards, for his use. The credit cards were used by PERSON-1 from November of 2016 through May of 2017, and PERSON-1 made purchases that exceeded $10,000 in total. PERSON-1 used the credit cards to buy items, such as women's clothing and cigars, that were unnecessary for the 30th Street Station repair and restoration project. PERSON-1 never repaid defendant HARDIKAR, or Vega, for his use of these credit cards;

**Fraudulent Billing Schemes Utilized By Defendant SANDEEP HARDIKAR**

f) Defendant SANDEEP HARDIKAR submitted invoices seeking the overpayment of wages due to Vega employees. Defendant HARDIKAR developed and implemented this fraudulent billing scheme. The construction management contract prohibited Vega from charging Amtrak a higher rate for employee labor than what Vega paid those employees. Vega repeatedly violated this contractual provision by charging Amtrak an inflated rate for its employees, paying the employees a percentage of the inflated rate, and pocketing the remainder as profit. As a result of this scheme, Amtrak paid Vega $373,626.47 that Vega should not have billed for or received;

g) Defendant SANDEEP HARDIKAR submitted invoices seeking payment for Scheduling and Estimating work allegedly performed by defendant HARDIKAR though he never performed this work. Amtrak thereby paid Vega $102,945.74 for work that was never performed; and

10

h) Defendant SANDEEP HARDIKAR submitted invoices seeking payment for Project Principal work allegedly performed by PERSON-2. Vega should not have billed Amtrak an hourly rate for work performed by PERSON-2 because PERSON-2 owned Vega, an S Corporation, and should have been compensated through the company's profits. Defendant HARDIKAR knew PERSON-2's hourly rate of $274.73 was excessive and unjustified. HARDIKAR prepared and submitted the timesheets for PERSON-2, but he did not verify that PERSON-2 worked the hours he recorded on his/her timesheet. Amtrak thereby paid Vega $252,795.80 for Project Principal work that should never have been charged, was overpriced, and was not performed in full.

## OVERT ACTS

In furtherance of this conspiracy, and to achieve its objects, defendant SANDEEP HARDIKAR, PERSON-1, and PERSON-2 committed the following overt acts, among others:

1. On or about November 1, 2016, defendant SANDEEP HARDIKAR authorized PERSON-1 to use defendant HARDIKAR's personal credit card to purchase roundtrip airfare to India in the amount of $4,437.51.

2. On or about January 31, 2017, PERSON-2 leased an SUV for PERSON-1's use by signing an agreement to lease a Ford Explorer with a retail value of $46,260.42 from a Maryland car dealership.

3. On or about April 16, 2017, defendant SANDEEP HARDIKAR sent an email to a Vega co-worker about the hourly rate to charge Amtrak for PERSON-2. Because Vega was proposing a $150 hourly rate, defendant HARDIKAR wrote in the email "we need to come up with some reasoning and some change conditions to justify the time."

4. On or about May 15, 2017, Vega hired PERSON-1's family member to a paid internship.

5. On or about May 23, 2017, PERSON-2 certified the payroll for Vega. The certified payroll charged Amtrak $274.73 per hour for PERSON-2, and sought payment for 70 hours of work that PERSON-2 allegedly performed from September 5, 2016, through December 29, 2016.

6. On or about June 22, 2017, PERSON-2 sent a text message to defendant SANDEEP HARDIKAR stating, "Deposited May payroll and extra 8000."

7. On or about June 22, 2017, defendant SANDEEP HARDIKAR gave PERSON-1 an $8,000 cash bribe.

8. On or about June 23, 2017, PERSON-1 deposited $8,000 cash into a bank account in his/her name.

9. On or about August 21, 2017, Vega hired a friend of PERSON-1, K.S., to a salaried position with the title "Auditing Manager," even though defendant SANDEEP HARDIKAR knew that K.S. was not needed to complete Vega's work on the project.

10. On or about September 4, 2017, Vega hired a friend of PERSON-1, C.S., to a salaried position with the title "Accounting Auditor," even though defendant SANDEEP HARDIKAR knew that C.S. was not needed to complete Vega's work on the project.

11. On or about September 12, 2017, PERSON-2 certified the payroll for Vega, thereby charging Amtrak $113.69 per hour for 36 hours of Scheduling and Estimating work that defendant SANDEEP HARDIKAR never performed.

12. On or about September 18, 2018, PERSON-2, acting on behalf of Vega, signed a contract with Amtrak, thereby committing Vega to perform construction management services through December 31, 2019, in exchange for payments from Amtrak totaling $2,911,195.56.

13. On or about January 26, 2019, PERSON-2 leased an SUV for PERSON-1's use by signing an agreement to lease a Ford Explorer Platinum with a retail value of $57,352.50 from a Maryland car dealership.

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF FORFEITURE

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1. As a result of the violation of Title 18, United States Code, Section 371, charging conspiracy to violate Title 18, United States Code, Sections 666(a)(2), 1341, and 1343, set forth in this information, defendant

**SANDEEP HARDIKAR**

shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such violation, including, but not limited to,

    (a) the sum of $786,247.50; and

    (b) the sum of $578,103.85 that was seized on or about November 14, 2019, from an account (ending in – 5035) that Vega maintained at TD Bank.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

    (c) has been placed beyond the jurisdiction of the Court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C).

**JENNIFER ARBITTIER WILLIAMS**
**Acting United States Attorney**

No. _ _ _ _ _ _ _ _ _ _

**UNITED STATES DISTRICT COURT**

Eastern District of Pennsylvania

Criminal Division

THE UNITED STATES OF AMERICA

v.

SANDEEP HARDIKAR

**INFORMATION**

18 U.S. C. § 371 (conspiracy to commit wire fraud, mail fraud, honest services fraud, federal program bribery, and False Claims Act offenses – 1 count)

Notice of forfeiture

_____
A true bill.

_____
Foreman

Filed in open court this _____ day,

Of _____ A.D. 20 _____

_____
Clerk

Bail, $ _____